AO93 Search and Seizure Warrant

| | |
|---|---|
| X FILED | ___ LODGED |
| ___ RECEIVED | ___ COPY |

MAR 17 2026

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _NM_____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

In the Matter of the Search of
one (1) silver Apple iPhone 17 Pro, serial number:
J14N6T6XF0, IMEI: 354996269976297, and one (1) blue
Motorola Edge, serial number: unknown, IMEI:
351188230584938, both found in the possession of Julio
Cesar VASQUEZ-Ruiz

Case No. **26-1203MB**

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

### As further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before __3|31|2026__ *(not to exceed 14 days)* ☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on criminal duty in the District of Arizona.

☒ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☒ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: **3|17|2026 at 12:02 pm** _____

*Judge's signature*

City and state: Yuma, Arizona _____          Honorable James F. Metcalf, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is:

1. One (1) silver Apple iPhone 17 Pro, serial number: J14N6T6XF0, IMEI: 354996269976297, used by Julio Cesar VASQUEZ-Ruiz ("VASQUEZ").

2. One (1) blue Motorola Edge, serial number: unknown, IMEI: 351188230584938, used by VASQUEZ.

The described cell phones listed above are hereafter referred to as the "SUBJECT CELLULAR TELEPHONES." The SUBJECT CELLULAR TELEPHONES are currently located at the United States Border Patrol ("USBP") Yuma office, in Yuma, Arizona. This warrant authorizes the forensic examination of the SUBJECT CELLULAR TELEPHONES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be seized*

1.     Any records and information found within the digital contents of SUBJECT CELLULAR TELEPHONES that relate to violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute a Controlled Substance), occurring during the period beginning January 21, 2026, through and including March 14, 2026, including:

    a.  all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of drugs;

    b.  all information related to buyers or sources of drugs (including names, addresses, telephone numbers, contact information, photographs, locations, or any other identifying information);

    c.  all bank records, checks, credit card bills, account information, or other financial records reflecting the disposition of drug proceeds;

    d.  all information regarding the receipt, transfer, possession, transportation, or use of drug proceeds;

    e.  any information recording schedule or travel;

    f.  evidence indicating the cellular telephone and/or tracking device user's state of mind as it relates to the crime under investigation; and

    g.  contextual information necessary to understand the above evidence.

    h.  any data pertaining global positioning data, grid coordinates, and/or any other means of tracking the location and/or whereabouts of either the cellular telephone and/or the tracking device.

2.     Any records and information found within the digital contents of SUBJECT CELLULAR TELEPHONES showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, correspondence, photographs, and browsing history.

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone and/or tracking device.

AO 106 Application for a Search Warrant

FILED ____ LODGED
____ RECEIVED ____ COPY

MAR 17 2026

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY NM _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
District of Arizona

In the Matter of the Search of
one (1) silver Apple iPhone 17 Pro, serial number:
J14N6T6XF0, IMEI: 354996269976297, and one (1) blue
Motorola Edge, serial number: unknown, IMEI:
351188230584938, both found in the possession of Julio
Cesar VASQUEZ-Ruiz

Case No. 26-1203MB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

The application is based on these facts:

**See attached Affidavit**

☒ Continued on the attached sheet.
☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Matthew Greve

RICHARD KEELING (Affiliate) Digitally signed by RICHARD KEELING (Affiliate)
Date: 2026.03.17 10:16:32 -07'00'
*Applicant's Signature*

Richard Keeling, Task Force Officer, DEA
*Printed name and title*

Sworn telephonically and signed electronically.

Date: _3|17|2026_

City and state: _Yuma, Arizona_

*Judge's signature*

Honorable James F. Metcalf, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is:

1. One (1) silver Apple iPhone 17 Pro, serial number: J14N6T6XF0, IMEI: 354996269976297, used by Julio Cesar VASQUEZ-Ruiz ("VASQUEZ").

2. One (1) blue Motorola Edge, serial number: unknown, IMEI: 351188230584938, used by VASQUEZ.

The described cell phones listed above are hereafter referred to as the "SUBJECT CELLULAR TELEPHONES." The SUBJECT CELLULAR TELEPHONES are currently located at the United States Border Patrol ("USBP") Yuma office, in Yuma, Arizona. This warrant authorizes the forensic examination of the SUBJECT CELLULAR TELEPHONES for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be seized*

1.    Any records and information found within the digital contents of SUBJECT CELLULAR TELEPHONES that relate to violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute a Controlled Substance), occurring during the period beginning January 21, 2026, through and including March 14, 2026, including:

    a.  all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of drugs;

    b.  all information related to buyers or sources of drugs (including names, addresses, telephone numbers, contact information, photographs, locations, or any other identifying information);

    c.  all bank records, checks, credit card bills, account information, or other financial records reflecting the disposition of drug proceeds;

    d.  all information regarding the receipt, transfer, possession, transportation, or use of drug proceeds;

    e.  any information recording schedule or travel;

    f.  evidence indicating the cellular telephone and/or tracking device user's state of mind as it relates to the crime under investigation; and

    g.  contextual information necessary to understand the above evidence.

    h.  any data pertaining global positioning data, grid coordinates, and/or any other means of tracking the location and/or whereabouts of either the cellular telephone and/or the tracking device.

2.    Any records and information found within the digital contents of SUBJECT CELLULAR TELEPHONES showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, correspondence, photographs, and browsing history.

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone and/or tracking device.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Richard Keeling, being first duly sworn, hereby deposes and states as follows:

### I.     INTRODUCTION AND AGENT BACKGROUND

1.     Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to examine the cellular telephone and vehicle tracking device, described more particularly in Attachment A (hereafter the "SUBJECT CELLULAR TELEPHONES"), and to extract the electronically stored information set forth in Attachment B, which represents evidence and/or instrumentalities of the criminal violations further described below.

2.     Your Affiant is a detective with the Arizona Department of Public Safety ("AZDPS"), and has been assigned to the Drug Enforcement Administration ("DEA") Yuma office as a Task Force Officer ("TFO") since September 2016. Your Affiant graduated from the Arizona Law Enforcement Academy ("ALEA") in Phoenix, Arizona. At this academy, your Affiant received training in criminal investigations, which included illegal drug investigations. Your Affiant has also been trained in the recognition and identification of narcotics and dangerous drugs. He has attended the AZDPS Advanced Interdiction School, the Buckeye Police Department ("BPD") vehicle interdiction school, both the Texas DPS and AZDPS Interdiction for the Protection of Children Schools, and the Interview and Interrogation for Sex Crimes school. While attending the schools listed above, your Affiant was instructed on various trends and techniques used by drug smugglers to conceal and transport large quantities of drugs throughout the United States ("U.S."), common criminal indicators exhibited by drug smugglers while in transport, and interview techniques. Your Affiant has used the knowledge and techniques learned in training and applied them to his work in identifying and interdicting drug smugglers. As a result, your Affiant has worked on hundreds of drug related cases and has conducted

hundreds of interviews. Your Affiant is also a general instructor, a field training instructor, and has completed the AZDPS detective's school.

3.      Your Affiant attended the Arizona Narcotics Officer Association ("ANOA") conference in 2017, 2022, 2023, and 2025, and took multiple classes involving the investigation of drugs/narcotics at the conferences. Your Affiant attends continued training in an effort to stay current on specific trends and techniques used by drug smugglers in their activities, to learn about various drug smuggling organizations and structures, and to improve upon his knowledge by networking with other law enforcement officers/agencies and their techniques used in large scale drug investigations. At these conferences, your Affiant has learned about specific cartels and how they operate, their organizational structures, and their reach into and across the U.S. Your Affiant has learned about the various religious and cultural symbols commonly used by drug smugglers associated to Mexico-based cartels and organizations and has witnessed the same symbols used multiple times in the U.S. during his drug investigations. Your Affiant has learned to observe driving behavior of suspected couriers. The driving behavior can consist of techniques that when taken alone may seem normal, but when viewed in totality can lead your Affiant to a higher level of suspicion. For example, your Affiant has observed drug smugglers use vehicles registered to people other than themselves to smuggle drugs. Additionally, your Affiant has observed drug smugglers conduct "heat runs." Heat runs are, essentially, methods of driving intended to throw off surveillance attempts by law enforcement, which include unnecessarily complex routes of travel, unusual behaviors of the driver when law enforcement is visible (e.g., driving well below the speed limit), making sudden turns in and out of parking lots or residential areas, conducting multiple U-turns, and/or stopping and parking for short periods of time without getting out of the vehicle. Your Affiant has both learned about these types of driving behaviors and has observed them multiple times throughout his career while investigating drug smuggling organizations. Your Affiant also

2

completed the two-week DEA TFO School in Quantico, Virginia, in September 2017 where he took similar classes and learned of additional techniques and resources available to investigate large scale drug smuggling organizations.

4.    As mentioned above, your Affiant has initiated and been involved in hundreds of cases involving interdiction of sellable and personal use amounts of drugs, human smuggling, money laundering, and various other types of criminal activities, to include weapons violations. He has first-hand knowledge of the various techniques and trends used by criminals to smuggle contraband both into and through the country on the interstates and highways. Your Affiant has successfully assisted with bringing forth indictments and convictions on hundreds of criminal cases. He has specific experience as it relates to the smuggling of contraband through the southern border as a whole, to include trafficking on foot through open borders, and through manned entry points. He has interviewed hundreds of suspects, and has a comprehension of various routes, methods, and techniques used to conceal contraband to get it into the country and throughout the states, as well as the attempts to smuggle contraband from the U.S. into Mexico.

5.    Your Affiant has, with his experience and training, learned methods in which narcotics, dangerous drugs, weapons, and illegal cash proceeds are distributed, used, and transported. He has learned that illegal drug and weapons violators often keep documents and/or records of several sources in order to keep track of their illegal transactions. In your Affiant's experience, criminal violators keep paraphernalia, monies, weapons, and/or illegal drugs on their person and/or in their vehicles and/or homes in order to conduct their business, and monies are exchanged during illegal drug/weapons transactions. In your Affiant's experience, criminal violators keep weapons to protect themselves, their illegal drugs, and their proceeds. Furthermore, your Affiant has learned criminals often utilize electronic equipment to facilitate their criminal activity, such as cellular phones, thumb-drives, memory cards, and other such devices. Within these devices, criminals often send

3

and receive text messages, send and receive phone calls, and store information on them within accessible and hidden applications, all in an effort to facilitate and hide criminal activity. Part of your Affiant's training and experience consists of attending and successfully completing a Cellebrite cell phone extraction school. Your Affiant has used his training and has downloaded hundreds of cell phones and analyzed their contents. Your Affiant has personally viewed evidence retained in cell phones concerning the crimes listed above kept in text messages, messages in other applications on phones, pictures, videos, audio, GPS data, contact data, call histories, etc. As a result of his experience, your Affiant has authored hundreds of search warrants and court orders with the intent to retrieve evidence from cell phones, vehicles, homes, businesses, tracking data, persons, etc.

6.      Your Affiant has also, in the past, seized a tracking device found in a drug laden vehicle and petitioned to view its contents. Your Affiant successfully conducted an extraction on a SIM card in that device which led your Affiant to discover the device was connected to a known target of the investigation due to a phone number belonging to that target found in the memory of the SIM card in the tracking device.

7.      The facts contained in this Affidavit are based in part on information provided to your Affiant, by DEA and other law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; and information learned through seizures of contraband. Your Affiant also relies on his own experience, training, and background in evaluating this information.

8.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant not set forth all of the relevant facts known to law enforcement officers.

## II.    BASIS FOR PROBABLE CAUSE

9.      On January 22, 2026, your Affiant, was contacted by the United States Border Patrol ("USBP") and asked to respond to a traffic stop conducted by the Yuma

4

County Sheriff's Office ("YCSO") on State Route 195 ("SR-195") in which a large amount of suspected drug contraband was found in a white Nissan Frontier. Your Affiant responded with another investigator.

10. Upon arrival, your Affiant was told USBP investigators had been conducting surveillance on the white Nissan Frontier as it left Interstate 8 ("I-8") and headed southbound on SR-195, towards San Luis, Arizona. Investigators said they observed the Nissan park in a parking lot of a grocery store in San Luis and watched as a Hispanic male, later identified as Alejandro FELIX-Ojeda ("FELIX"), exit the driver's side, and a Hispanic female, later identified as Lizeth Anai GUZMAN-Maya ("GUZMAN") exit the passenger side. Investigators said both FELIX and GUZMAN went inside the grocery store.

11. Investigators said, within a few minutes, a third Hispanic male, later identified as Juan Armando MEZA-Valdez ("JUAN MEZA") exited the grocery store, got into the white Nissan and left the parking lot. Investigators followed the Nissan and watched it park in a garage of a house in San Luis, later identified to be the registered address of JUAN MEZA, with the garage door closed behind it. Approximately 30 minutes later JUAN MEZA opened the garage, drove the Nissan back to the same parking lot, got out of the Nissan, got into a blue Mustang, later determined to be registered to him, and drove away.

12. Investigators split their efforts and continued surveillance on both the white Nissan and the blue Mustang. USBP investigators contacted the YCSO and asked for assistance with the Nissan. A YCSO deputy observed the Nissan traveling at a high rate of speed northbound on SR-195 and conducted a traffic stop on it for the civil speed violation. During the course of the stop, the deputy asked FELIX for consent to allow an open-air sniff from a canine and FELIX granted consent. A USBP canine was deployed and gave a positive alert on the vehicle.

5

13.    A probable cause search was conducted and investigators found 21 rectangular, plastic wrapped packages, containing a white powdery substance, in natural voids behind both rear tail light areas. The weight of the packages was 57.6 pounds. One of the packages was later field tested and it tested positive as cocaine. Investigators also found a black vehicle tracking device inside one of the natural voids with the drug packages and seized it. Investigators arrested FELIX and GUZMAN. Investigators then seized a black Apple iPhone from FELIX as well.

14.    A short time later, JUAN MEZA was arrested at a different store parking lot in San Luis, Arizona, after the drug contraband had been discovered. All three suspects were taken to the Yuma DEA office for further investigation, and all three subjects consented to post-Miranda interviews.

15.    JUAN MEZA admitted to receiving the drugs earlier that morning from a separate vehicle and unknown courier and storing them in an empty clothes dryer in his garage at his residence. He said he was instructed by his handler, who he identified as his "brother" Issac MEZA-Valdes ("ISSAC MEZA"), to go to the grocery store parking lot, pick up the white Nissan, load it with the drugs, and return it to the same parking lot. JUAN MEZA said once he dropped off the drug laden vehicle, he left in his blue Mustang.

16.    JUAN MEZA said the vehicle that arrived at his house that morning with the drugs was a grey Jeep Grand Cherokee. JUAN MEZA said the vehicle was still parked in front of the house. Investigators went to the house and saw a grey Jeep Grand Cherokee, bearing Arizona registration #HLA4GS, parked in the driveway of JUAN MEZA's residence.

17.    Investigators used a law enforcement database to run the vehicle registration and found it to be registered to Julio Cesar VASQUEZ Ruiz ("VASQUEZ"). Investigators conducted a crossing history of the Jeep and found that VASQUEZ had crossed the Jeep from San Luis, Mexico into the United States that morning.

6

18.    On March 14, 2026, VASQUEZ crossed from San Luis, Mexico into the United States in the Jeep. Your Affiant and another investigator responded to the San Luis port of entry ("POE") and conducted an interview with VASQUEZ.

19.    VASQUEZ said he did cross the Jeep from San Luis, Mexico into the United States that morning and parked it at JUAN MEZA's residence. VASQUEZ said he left the vehicle there for several days after because the crossing lines were long. A crossing history showed VASQUEZ crossed into the United States using the pedestrian lanes for several days after JUAN MEZA's arrest. VASQUEZ did not admit knowledge of drugs in the vehicle. VASQUEZ said he heard that the "brother" of his friend (ISSAC MEZA) had been arrested and believed he may have been a drug user. VASQUEZ said he was aware that law enforcement was at the residence and believed they recorded all the license plates of the vehicles at the location.

20.    VASQUEZ had the SUBJECT CELLULAR TELEPHONES in his possession and they were seized by investigators.

21.    Based on the circumstances listed above, and his training and experience, your Affiant believes there is probable cause to believe evidence of the crime exists in both the black Apple iPhone and the vehicle tracking device.

22.    The SUBJECT CELLULAR TELEPHONES are currently in storage at the USBP Yuma office.  In his training and experience, your Affiant knows the SUBJECT CELLULAR TELEPHONES have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT CELLULAR TELEPHONES first came into the possession of investigators. Therefore, it is believed the SUBJECT CELLULAR TELEPHONES contain evidence of the crimes committed by FELIX, JUAN MEZA, ISSAC MEZA, VASQUEZ, and other persons as yet unidentified, and may assist with identifying said co-conspirators and

7

potential contraband storage locations, as well as provide records of communications between each member.

III.    **ITEMS TO BE SEIZED**

23.    Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B, respectively, will be found in the contents of the SUBJECT CELLULAR TELEPHONES, respectively.

24.    Based on your Affiant's training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    Drug traffickers commonly use cellular telephones to communicate with other drug traffickers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug traffickers commonly use other capabilities of cellular telephones to further their drug trafficking activities. Therefore, evidence related to drug trafficking activity is likely to be found on the SUBJECT CELLULAR TELEPHONES.

b.    Drug traffickers often have access to large amounts of United States currency in order to maintain and finance their ongoing trafficking activities. Therefore, records of the movement of drug proceeds, including deposits, transfers, and purchases, are likely to be found on the SUBJECT CELLULAR TELEPHONES.

c.    Drug traffickers and persons involved in the manufacturing, distributing, sorting, and possession of controlled substances often possess firearms and other weapons, both legal and illegal, in order to protect their person, drugs, or the proceeds of drug transactions. Moreover, drug traffickers commonly take photographs of their firearms. Therefore, photographs of firearms and records related to the possession,

8

acquisition, and sale of firearms are likely to be found on the SUBJECT CELLULAR TELEPHONES.

d.       Drug traffickers often use commercial tracking devices hidden within drugs, vehicles, bulk money loads, and other contraband in an effort to remotely track their contraband items. Based on the make and model of the tracking device, some have the capability of also remotely listening in on conversation had near the device as well.

25.       In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the SUBJECT CELLULAR TELEPHONES.

## IV.       DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE

26.       As described in Attachment B, respectively, this application seeks permission to search for records and information that might be found in the contents of the SUBJECT CELLULAR TELEPHONES, respectively. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

27.       *Probable cause.* Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the SUBJECT CELLULAR TELEPHONES for at least the following reasons:

a.       Your Affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The cellular telephone and tracking device are an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular telephone and tracking device are also likely to be a storage medium for evidence of crime. From your Affiant's training and experience, your Affiant believes that a cellular telephone and/or a tracking device used to commit a crime of this type may contain: data that is evidence of how the cellular telephone and/or tracking device

9

was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b. Based on your Affiant's knowledge, training, and experience, your Affiant knows that cellular telephones and tracking devices can contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone and/or the tracking device, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c. Based on your Affiant's knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone and/or a tracking device, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone and/or tracking device can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone and/or a tracking device, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone and/or tracking device until it is overwritten by new data.

d. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone and/or tracking device that is not currently being used by an active file—for long periods of time before they are

10

overwritten. In addition, a cellular telephone's and/or tracking device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

28.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone and/or tracking device was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the SUBJECT CELLULAR TELEPHONES because:

a.    Data in a cellular telephone and/or tracking device can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    As explained herein, information stored within a cellular telephone and/or tracking device may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone and/or tracking device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone and/or tracking device was remotely accessed, thus inculpating or exculpating the owner. Further, activity on a cellular telephone and/or

11

tracking device can indicate how and when the cellular telephone and/or tracking device was accessed or used. For example, as described herein, cellular telephones and/or tracking devices can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone and/or tracking device, and the IP addresses through which the cellular telephone and/or tracking device accessed networks and the internet. Such information allows investigators to understand the chronological context of cellular telephone and/or tracking device access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular telephone and/or a tracking device may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular telephone and/or a tracking device may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may either inculpate or exculpate the user of the cellular telephone and/or the tracking device. Last, information stored within a cellular telephone and/or tracking device may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.    A person with appropriate familiarity with how a cellular telephone and/or a tracking device works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone and/or tracking device was used, the purpose of its use, who used it, and when.

12

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone and/or tracking device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone and/or tracking device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone and/or tracking device is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a cellular telephone and/or tracking device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

27.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise copying the contents of the SUBJECT CELLULAR TELEPHONES, respectively, including the use of computer-assisted scans, with respect to violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), occurring during the period beginning January 21, 2026, through and including March 14, 2026.

28.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

13

## V.    CONCLUSION

29.    Your Affiant submits there is probable cause to believe that the items listed in Attachment B, respectively, which constitute evidence and/or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) are likely to be found in the contents of the SUBJECT CELLULAR TELEPHONES, respectively, further described in Attachment A, respectively.

RICHARD KEELING (Affiliate)

Digitally signed by RICHARD KEELING (Affiliate)
Date: 2026.03.17 10:17:33 -07'00'

Task Force Officer Richard Keeling
Drug Enforcement Administration

Subscribed and sworn to before me this ___17ᵗʰ___ day of ___March___, 2026.

HONORABLE JAMES F. METCALF
United States Magistrate Judge

14